The Judges delivered their opinions.
JUDGE TUCKER.
The first question which presents itself on the bill of exceptions filed in this case, is, whether the two writs of fieri facias which issued from the District Court of Richmond the 21st day of January, 1800, at the suit of Bullitt’s executors, one of which was against the goods of John Carter Littlepage, Thomas Starke, Samuel Jordan Winston, and Edward Winston ; and the other against J. C. Little-page, S. J. Winston, and E. Winston, only, and which were proved to have come to the hands of William Clarke, as Deputy Sheriff for Thomas Tinsley, Sheriff of Hanover County, to execute, were actually levied, or not, by the said William Clarke. And I am of opinion, that the evidence is sufficient to prove that they were. [Here Judge Tucker recited the evidence relative to the levying; in substance as above stated.]
The simple question upon this evidence is, whether it be sufficient to prove that the execution was levied? When the Sheriff had declared his intention to levy the execution on the slaves in his view; when no opposition was made to his levying the execution on those slaves; (whether near, or at a distance does not appear, and therefore I shall presume they were in his presence;) when he had taken a list of their names, (as the law requires in such cases,) 279 which he probably *must have been informed of by their master Edward Winston, then present; and when Winston and Peter Crutchfield (whose undertaking is out of the question, at present, as both executions were endorsed, “no security to be taken”) had undertaken to produce the slaves on the day of sale; can there be a doubt that it was unnecessary to touch them, in order to give effect to the levy? The Sheriff acted at his own peril, in leaving the slaves behind him, it is true; but there is nothing in law, nor in reason, to prohibit him from doing so, if, from his knowledge of the party in whose possession they are taken, he has sufficient confidence to intrust him with the care of them till the day of sale. The inconvenience, and, in many instances, the cruelty, of a contrary practice need not be dilated upon. The same may be said of the slave in the possession of Timberlake; as he did not oppose the levying of the execution, notwithstanding his possession of the slave, and his interest therein to the end of the year, no other person had a right to dispute it. He produced the slave on the day of sale, which is an additional proof that he admitted that the execution had been duly levied. We are not here to inquire how the Sheriff ought to have proceeded after this; suffice it to say, that, it being uncertain whether the property so taken (for neither the number, nor the names of the slaves now appear, although the Sheriff deposed that he believes the names of the slaves were put on the back of the execution, but that the writing is now erased, except the name of one) was or was not sufficient to satisfy the amount of the executions; and it appearing from Clarke’s own evidence that he did not levy them on any property belonging to Littlepage, and it being uncertain (as not being mentioned) whether any property of Starke, the fourth defendant named in one of the executions, was taken, or not, the presumption, until the contrary be shewn, is, that the slaves of Edward Winston, on which the execution was levied, together with that of Jordan Winston, on which it was levied, were sufficient to satisfy both those executions.
*112 The *Court, I think, decided rightly in ordering, that William Clarke, a former Deputy Sheriff of Hanover, be permitted to make a return upon those executions, according to the truth of the case: and, until the return was so made; or if, upon that return, it should appear that the propertj' taken was sufficient to satisfy those executions, I think the latter execution ought to have been superseded, if still in the hands of the Sheriff, or quashed, if returned to the office. As we have no copy of that execution in the record, I cannot give a more precise opinion upon the point. In the case of Eckhols v. Graham, this Court is reported to have decided that, by taking out a second execution, the plaintiff had waived the benefit of the first, and discharged the lien upon the slaves taken upon it. (a) But I think that case does not apply to the present; for, until a return made upon those executions, it does not legally appear whether the property taken hath been sold, dr whether it was sufficient to satisfy the whole, or only a part of those executions.
The second question is, whether the letter from Thomas Harrison, one of Bullitt’s executors, directed to the Sheriff of Hanover, dated March 12, 1800, wherein he desires to put off the sale of the property taken in execution to the 1st day of A ugust, holding the property subject to the said executions, and to suffer it to remain in the hands of Eittlepage or his securities, was a release of the property so taken as to Jordan Winston, who is expressly stated to have known nothing of the transaction, or to have acquiesced in the indulgence granted by Harrison, until after the third execution was issued. Now, certainly, from the very terms of the letter, it appears that Harrison never had any intention to release the property; for he directs the Sheriff to hold the property subject to the executions. The Sheriff, therefore, was not authorized to do any thing more than to postpone the sale, leaving the slaves, where they were, in the possession of Littlepage or his secu-„ rities. But how was this to be done? Not by the Sheriff, virtute officii, because the endorsement on the executions pro-281 • hibited him, *as Sheriff, from taking1 any security. Having levied the executions, he was bound at his own peril, that the slaves should be sold: he encountered that peril when he left the slaves in the hands of Edward Winston and Timber-lake, on their promise to produce them on the day of sale. When Timberlake brought Jordan Winston’s slave, according to his promise, to be sold, he had fulfilled his promise: the slave was constructively, at least, in the Sheriff’s possession ; and he was bound for his safe keeping until sold.
The person for whose benefit the executions issued, authorized him to suffer the slave to remain in the hands of Eittlepage, or his securities; yet bids him hold them subject to the executions. Under the circumstances of this case he could not do this, as Sheriff. If the Sheriff, in pursuance of this order, suffered the slaves to return with the privity or consent of Jordan Winston, he acted in this instance as the plaintiff’s private agent, and not as an officer. The case is still stronger if he did so'without the privity or consent of Jordan Winston. From that moment the slave was no longer in the custody of the Sheriff, as an officer, nor could he be retaken bv him at any time, as he might have been if he had not been produced to be sold; for Timberlake was his bailee, until the day of sale, and he might have seized the slave, and put him in prison, or delivered him to the safe keeping of any other person, until that time. But in permitting the slave to return with Timberlake, he acted only as the private agent of Harrison. It would have been otherwise if the sale had been necessarily put off, for want of buyers; for in that case, the slave would still have remained in his. custody. But here the case was different: the plaintiff grants an indulgence to one defendant, at the possible loss, or injury of another.
Suppose the slave had died, or had run away, before the 1st of August: if the postponement was without his owner’s consent or privity, ought he to be chargeable a second time for the value of what the 282 slave would have sold for if *the indulgence had not been given to the principal defendants? It seems then to me, that this indulgence granted to Carter Eittlepage, the principal debtor, without the consent or privity of Jordan Winston, (for" I mean to say nothing as to the other defendants,) amounted toa release as to him; the property once taken upon the execution being, by the act and consent of the plaintiff, put out of the custody of law, in which it had before been.
But, if it be otherwise, a third question still remains. Is there not evidence upon this record, sufficient in law, to shew that these executions have been fully discharged. . Clarke, the Sheriff, who levied these executions, swears, “That he as Deputy Sheriff received his full commission on the said executions issued in the year 1800, from 'J. C. Eittlepage, and the said Starke. ” Now the fee bill(b) allows to the Sheriff for proceeding to sell on any execution on behalf of the Commonwealth, or of any individual, if the property be actually sold, or the debt paid, the commission of five per cent., &c. and no other commission, fee, or reward, shall be allowed upon any execution, except for the expense of removing and keeping the property taken, (c) The Sheriff being thus prohibited from receiving any commission unless the property be actually sold, or the debt paid, and having acknowledged that he has received his full commissions on both executions, the conclusion in law is, that they have been fully satisfied. And of this conclusion the defendant Jordan Winston, for the reasons before mentioned, is entitled to avail himself, as he hath done in the present instance. I am therefore of opinion, that the judgment of the District Court, so far as relates to him, ought to be affirmed.
As to the blank in the execution, for the name of the County; that may be amended by the Sheriff, pursuant to the order of the Court. His testimony sufficiently proves *113 that it came to his hands as Deputy Sheriff of Hanover, and he may be compelled to amend his return accordingly.
* JUDGE ROANE.
I shall not waste time to prove, that the facts stated in the bill of exceptions amounted to a complete levying of the execution of January 21st, 1800, and was so considered by all parties. Being so levied, the Sheriff took the personal engagement of the parties, to produce the property on the day appointed for the sale, viz. 20th March, 1800; on which day one of the slaves was produced ; and the others were not produced, probably from a knowledge existing in the neighbourhood, that the sale of the same had been postponed, by the consent of the plaintiffs. The letter, under which the sale on that day was dispensed with, was written without the privity or consent of the appellees; and the releasement of the property purported thereby, was founded on a consideration flowing from the principal debtor, Dittlepage, to the plaintiffs. That letter either operated a complete discharge of the property from the execution, or, at least, by holding the property still subject thereto, precluded any further execution until it was finally disposed of. Considered in either point of view, the truth of the case ought to have been returned, at the day, by the Sheriff; which, had it been done, would have prevented the Clerk from issuing a new execution. The most favourable point of view for the appellants is, to consider the first execution as not discharged, but as continuing : in that view, there was no necessity for issuing the second. The law does not permit our citizens to be harassed by repeated and unnecessary executions.
The case of Baird v. Rice (a) is a complete a.uthority for the defendants, both as to the propriety of suffering a Sheriff to amend his return according to the truth of the case, and as to the effect (in favour of the security) of a restoration of the property by the Sheriff, to the defendant, with the consent of the plaintiff. Indeed,' it is a complete authority in the present case, in which it is unimportant to the success of the appellees, whether the first execution be considered as discharged, or continuing: it is the rather an authority, because in that case there was some evidence 284 that *the security, Rice, acquiesced in the arrangement for the discharge of the property, whereas, nothing of the kind is shewn in the case before us.
I think this a very plain case, and that the judgment of the District Court quashing the second execution, should be affirmed.

 1 Call, 494.

 1 Rev. Code, c. 95, s. 8.

 Ibid. c. 151, s. 33, accordant.

 1 Call, 18.